The PEOPLE of the State of Colorado,
Plaintiff–Appellant

v.

Lance Eugene FERGUSON,
Defendant–Appellee.

No. 09SA375.

Supreme Court of Colorado,
En Banc.

March 22, 2010.

Pete Hautzinger, District Attorney, Twenty–First Judicial District, Christopher Nerbonne, Deputy District Attorney, Grand Junction, Colorado, Attorneys for Plaintiff–Appellant.

David Eisner Law, David G. Eisner, Grand Junction, Colorado, Attorney for Defendant–Appellee.

Justice RICE delivered the Opinion of the Court.

In this interlocutory appeal pursuant to C.A.R. 4.1, we review a Mesa County District Court order suppressing evidence obtained from a police interrogation of the defendant-appellee Lance Ferguson. We find that the trial court erred in suppressing the evidence because Ferguson made a voluntary, knowing, and intelligent waiver of his *Miranda* rights prior to the interrogation. We therefore reverse the trial court's order.

## I. Facts and Procedural History

On the night of November 12, 2008, an officer on patrol observed a white Isuzu driving with expired license tags. After the officer pulled over the vehicle, the driver, who was later identified as Ferguson, claimed that his name was Cody Newitt and that he lacked proof of insurance, registration, and a driver's license on his person. The officer checked the name Cody Newitt in his patrol car, and it came back without any record. When the officer attempted to arrest him, Ferguson resisted and fled the scene, losing the officer after a half-mile chase through the surrounding area.

The officer returned to the scene and, in an attempt to find identification, observed drug paraphernalia in plain view and a wallet with multiple credit cards in various names. Meanwhile, other officers found Ferguson hiding in the bushes in the area and brought him back to the scene. At this point, the officer confirmed that Ferguson was the driver and placed him under arrest.

At the booking area, the officer read Ferguson his *Miranda* rights, which Ferguson said he understood. Ferguson initially agreed to speak with the officer on a limited basis, but after the officer began the questioning by showing Ferguson a picture of the real Cody Newitt, Ferguson said he wished to consult an attorney. The officer escorted Ferguson back to his cell without further questioning. Shortly thereafter, staff at the jail informed the officer that Ferguson had requested the opportunity to speak to him. The trial court found on the record that Ferguson initiated this conversation entirely of his own volition. The officer briefly conversed with Ferguson, who admitted his true identity. No further questioning occurred.

Two days later, Investigator Mike Piechota and his partner initiated a formal interrogation of Ferguson while Ferguson was still in custody. Ferguson stated upon entering the interrogation room that "I don't know that now's a good time." He claimed to be having mental problems and that his mind was "shuttering" due in part to withdrawal from methamphetamine, which he had been using up until three days prior. He repeatedly

asked for mental help, stating that he should be in an asylum and that he could not stay indoors in the jail because it was like a coffin. He also claimed that Investigator Piechota could get him to admit to anything and that "I don't understand anything right now." When asked if he could proceed with the questioning, Ferguson said, "there's a lot of static around but I'll try." Ferguson, however, was outwardly calm, collected, and rational, stating that "I want to talk to you" and "I want to be very cooperative." Nothing in his actions evinced any debilitating mental problem or confusion at the proceedings.

Most importantly, Ferguson stated at one point, "I do feel like maybe there needs to be a lawyer or my mother here or something." Investigator Piechota responded that it was entirely Ferguson's decision whether to proceed with the interrogation: "If you want to talk to us, that's on you. If you want to wait, that's also on you. But you need to tell me what you want to do." Ferguson clearly responded, "I want to talk to you; I do." Then, after some brief discussion of Ferguson's drug problems, Investigator Piechota commented to Ferguson that Ferguson seemed "pretty coherent" and seemed to be "understanding the questions," to which Ferguson agreed. Ferguson then asked if Investigator Piechota could get him some "mental health," and Investigator Piechota agreed to try before immediately beginning a detailed explanation of his *Miranda* rights. After asking Investigator Piechota not to "use" him, Ferguson signed a form listing his *Miranda* rights while Investigator Piechota again emphasized that Ferguson could stop the questioning at any time.

Ferguson's actions throughout the nearly two hours of questioning were somewhat nervous and jittery, but he appeared composed and in full control at all times. He answered questions calmly, rationally, and without ever losing his focus or train of thought, and he admitted his criminal acts prompting the current incarceration. He broke down at one point, confessing his wrongs and recognizing that he had let down everyone, especially his mother. He also stated that he would fear for his personal safety in jail because of what he had done. He repeatedly expressed regret for his actions, acknowledging his many prior felonies and stressing the theme that he needed professional help to end his drug addiction.

Prior to trial, Ferguson moved to suppress the evidence and statements, and the trial court held a hearing, heard from witnesses, and admitted the interrogation video into evidence. After reviewing *Miranda* law, the court wrote:

> Here, the Court finds that the prosecution has failed to meet its burden of showing that the defendant made a knowing, intelligent and voluntary decision to waive his *Miranda* rights given the defendant's clearly expressed need for help with the mental health issues and that from the moment he sat down he began telling investigators of his impaired ability to understand what was taking place. The Court also finds that coercive governmental conduct played a significant role in inducing the defendant to make a statement. The Court therefore finds that the defendant did not knowingly, voluntarily and intelligently waive his rights pursuant to *Miranda* and orders the use of statements he made to investigators on November 14, 2008 suppressed.

The State brought this interlocutory appeal.

## II. Analysis

### A. The Standard of Review and *Miranda* Law

In a motion to suppress evidence, the trial court must find facts and apply the law. *People v. Platt*, 81 P.3d 1060, 1065 (Colo.2004); *People v. Kaiser*, 32 P.3d 480, 483 (Colo.2001); *People v. Gennings*, 808 P.2d 839, 844 (Colo.1991). We defer to the trial court's findings of fact unless they are clearly erroneous or unsupported by the record. *Platt*, 81 P.3d at 1065; *Kaiser*, 32 P.3d at 483. However, "whether the trial court applied the correct legal standard to the facts established by the record is a mixed question of fact and law we review de novo." *Platt*, 81 P.3d at 1065 ("[A] trial court may not reach legal conclusions that are not supported by the record."). Hence, we defer to the trial court's finding of facts in the record but review all legal conclusions de novo, including

the application of legal factors to the facts of the case.

 Prior to a custodial interrogation, the Fifth Amendment requires that the police give a *Miranda* advisement to inform the defendant of his constitutional rights. *Miranda v. Arizona*, 384 U.S. 436, 444, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966). "Suspects can waive their rights upon receiving a proper *Miranda* advisement; however, in order to be valid, the waiver must be voluntary, knowing, and intelligent." *Platt*, 81 P.3d at 1065; *Miranda*, 384 U.S. at 444, 86 S.Ct. 1602. We have previously analyzed the validity of a waiver in two parts, asking first whether the waiver was voluntary and free of governmental coercion and second whether it was knowingly made with full awareness of the nature and consequences of the right. *See Platt*, 81 P.3d at 1065; *People v. May*, 859 P.2d 879, 882 (Colo.1993);[1] *People v. Hopkins*, 774 P.2d 849, 851 (Colo.1989). The State has the burden to prove the validity of the defendant's waiver by a preponderance of the evidence. *Colorado v. Connelly*, 479 U.S. 157, 168, 107 S.Ct. 515, 93 L.Ed.2d 473 (1986).

 In this case, we agree with the trial court that Ferguson was in custody, so *Miranda* applies. We also agree with the trial court that, because Ferguson volitionally initiated conversation with the arresting officer after invoking his *Miranda* rights on the night of the arrest, he validly waived his rights. *Edwards v. Arizona*, 451 U.S. 477, 484–85, 101 S.Ct. 1880, 68 L.Ed.2d 378 (1981) ("[A]n accused, . . . having expressed his desire to deal with the police only through counsel, is not subject to further interrogation by the authorities until counsel has been made available to him, unless the accused

himself initiates further communication, exchanges, or conversations with the police."); *Maryland v. Shatzer*, —— U.S. ——, 130 S.Ct. 1213, 1219, —— L.Ed.2d —— (2010) (endorsing and further defining the *Edwards* rule).[2]

With respect to Ferguson's statements to Investigator Piechota two days after the arrest, however, we reverse the trial court. We disagree with the trial court's ruling that "coercive government conduct played a significant role in inducing the defendant to make a statement," because the trial court provides no explanation of its reasoning and there are no examples in the record of coercive conduct. We also disagree with the trial court's ruling that, although Ferguson signed a printed form waiving his rights, the waiver was not knowing or intelligent because Ferguson was not mentally sound at the time. The trial court failed to engage in the proper totality of the circumstances analysis appropriate to the knowing element of a *Miranda* waiver. We discuss each error in turn.

### B. The Voluntary Element

 "A *Miranda* waiver is considered voluntary unless 'coercive governmental conduct—whether physical or psychological—played a significant role in inducing the defendant to make the confession or statement.'" *Platt*, 81 P.3d at 1065 (quoting *May*, 859 P.2d at 883); *Connelly*, 479 U.S. at 170, 107 S.Ct. 515 ("The voluntariness of a waiver of this [Fifth Amendment] privilege has always depended on the absence of police overreaching, not on 'free choice' in any broader sense of the word."). Voluntariness is an objective inquiry reviewing the record for outwardly coercive police action, not a

---

1. The *May* court actually included both elements of the analysis—coercion and knowing—under the general heading of voluntariness, which tends to confuse the analysis. *Compare May*, 859 P.2d at 883 ("To determine the validity of a waiver, a court must address the two separate dimensions of voluntariness: first is the presence or absence of coercion, which primarily concerns the effect of police conduct, and second is the knowing and intelligent action on the part of the person being interrogated.") *with Platt*, 81 P.3d at 1065 (distinguishing between the "voluntary" and "knowing and intelligent" elements). This is merely a semantic distinction, and this

discussion employs the term voluntary to describe only an absence of coercion—the first of the two elements.

2. This first finding of waiver on the night of the arrest is not in contention on appeal. In addition, we note that because there was a valid *Miranda* waiver initiated by the defendant on the night of the arrest, the Supreme Court's rule in *Shatzer* creating a fourteen-day period after which police may reinitiate questioning of a defendant does not apply. *Shatzer*, 130 S.Ct. at 1224–25.

subjective analysis attempting to arbitrarily surmise whether the defendant perceived some form of coercive influence. *See Connelly*, 479 U.S. at 169–71, 107 S.Ct. 515. The appellate court must reverse the trial court on this element if "the record is devoid of any suggestion that police resorted to physical or psychological pressure to elicit the statements." *Moran v. Burbine*, 475 U.S. 412, 421, 106 S.Ct. 1135, 89 L.Ed.2d 410 (1986); *see also People v. Jordan*, 891 P.2d 1010, 1015–16 (Colo.1995). Hence, we review the record, which includes a video of the entire interrogation,[3] for an instance of physical or psychological coercion on the part of the government. We find none.

Ferguson began the interrogation complaining of poor mental health, but Investigator Piechota did nothing to exacerbate or exploit this problem. Instead, Investigator Piechota consistently emphasized that Ferguson was under no obligation to speak to him at that moment and that the decision to continue was entirely Ferguson's. Although Investigator Piechota did offer to help Ferguson "get some mental health," he in no way made or implied a quid pro quo arrangement forcing statements in exchange for future medical aide. Also, any potential residual intoxication remaining from Ferguson's methamphetamine use falls under the intelligent and knowing element because it was not induced by the government. *Platt*, 81 P.3d at 1066. Because the trial court's finding of coercion is not supported in the record, we reverse it.

### C. The Knowing and Intelligent Element

■■■ "A waiver is knowing and intelligent when made with full awareness of the nature of the right being abandoned and the consequences of the decision to abandon it." *Id.* at 1065; *Hopkins*, 774 P.2d at 851. This is a totality of the circumstances analysis depending on a number of factors, none of which is independently determinative. *Platt*, 81 P.3d at 1065; *Kaiser*, 32 P.3d at 484. We have observed:

**3.** We have previously noted that a video of a *Miranda* advisement "enables us to undertake this review not just from the 'cold record,' but— at least in part—in precisely the same manner as

In assessing the validity of a *Miranda* waiver, factors a court may consider include, but are not limited to, the following: the time interval between the initial *Miranda* advisement and any subsequent interrogation; whether and to what extent the interrogating officer reminded the defendant of his or her rights prior to the interrogation by asking if the defendant recalled his or her rights, understood them, or wanted an attorney; the clarity and form of the defendant's acknowledgement and waiver, if any; the background and experience of the defendant in connection with the criminal justice system; the defendant's age, experience, education, background, and intelligence; and whether the defendant has any language barrier in understanding the advisement.

*Platt*, 81 P.3d at 1065–66 (citing *Kaiser*, 32 P.3d at 484).

In *Platt*, we also included mental competence or intoxication as another factor, providing another set of subfactors to guide this inquiry. These subfactors include:

whether the defendant seemed oriented to his or her surroundings and situation; whether the defendant's answers were responsive and appeared to be the product of a rational thought process; whether the defendant was able to appreciate the seriousness of his or her predicament, including the possibility of being incarcerated; whether the defendant had the foresight to attempt to deceive the police in hopes of avoiding prosecution; whether the defendant expressed remorse for his or her actions; and whether the defendant expressly stated that he or she understood their rights.

*Platt*, 81 P.3d at 1066 (citing *Kaiser*, 32 P.3d at 484; *Al-Yousif*, 49 P.3d at 1172; *Jordan*, 891 P.2d at 1015–16).

We apply the general knowing and intelligent factors to this case, beginning with the time between the *Miranda* advisement and the interrogation. Here, there were two ad-

the trial court." *People v. Al–Yousif*, 49 P.3d 1165, 1172 (Colo.2002); *see also Platt*, 81 P.3d at 1067 ("We are in the same position as the trial court to review these recorded statements.").

visements—one on the night of the arrest and another immediately before the formal interrogation. Police issued both of these advisements in close proximity to Ferguson's statement, with the written waiver immediately preceding it. Second, Investigator Piechota stressed the fact that the decision to give a statement was entirely Ferguson's, reminding him of his rights before any waiver occurred. Third, the clarity of the waiver was sufficient because Ferguson had two days to consider his rights after the first *Miranda* advisement, was again told his rights by Investigator Piechota, was provided with a printed copy of his rights, and then signed the waiver in two places. Fourth, Ferguson had experience with the criminal justice system based on his prior felonies, so the concepts of personal rights and incarceration were not foreign to him. Fifth, the video evidence demonstrates that Ferguson was of at least normal intelligence based on his ability to understand questioning, respond lucidly, and describe his criminal acts to Investigator Piechota. Finally, there was no language barrier as Ferguson is a native English speaker. All of these general factors militate in favor of a valid waiver, but the trial court considered none of them in its suppression order.

The trial court based its order entirely on the mental competency factor, but even this factor indicates a valid waiver. Taking its subfactors individually, we begin by observing in the video statement that Ferguson seemed perfectly aware of his surroundings and the situation, commenting that "I want to talk to you" and "I want to be very cooperative." Next, Ferguson rationally responded to Investigator Piechota's questioning for nearly two hours without ever becoming disengaged from or confused by the interrogation. There were no signs of any residual intoxication from his methamphetamine use three days prior. Third, Ferguson ostensibly appreciated the seriousness of the charges, breaking down at one point and saying that he had let down everyone with his actions. He also noted that he would have to fear for his physical safety in jail because he had angered certain groups, demonstrating an appreciation that the actions to which he was currently admitting would result in jail time. Fourth, although there were no obvious attempts at deception from Ferguson, he did display an awareness that his statements were part of a criminal investigation that could implicate others, frequently commenting that certain people or friends were not involved or should not be brought into the investigation. Fifth, Ferguson expressed considerable remorse throughout the nearly two hours, breaking down multiple times to express regret for his actions. Finally, when Investigator Piechota commented that Ferguson appeared to understand the proceedings, Ferguson readily agreed. Moreover, Ferguson signed a waiver that expressly stated that he understood his rights.

Although statements like "I don't know that now's a good time" and "I don't understand anything right now" cast doubt upon the knowing and intelligent element, those statements do not form the entirety of our analysis. Instead, we apply the aforementioned legal factors to the record and reach a conclusion based on the totality of the circumstances. The trial court failed to apply the full test for a knowing and intelligent waiver, entirely omitting the totality of the circumstances analysis. Based on the record, we find that the totality of the circumstances indicates that Ferguson was given the *Miranda* advisement twice during custody; was both read and given a printed copy of the advisement immediately preceding the interrogation; had the choice whether to continue clearly presented to him; had experience with the criminal justice system; was intelligent enough to understand his rights; understood English; was aware of his surroundings and the situation; provided rational, lucid answers to the questioning; appreciated the charges and their consequences; expressed reasonable remorse for his actions; and was not the subject of any police coercion. Therefore, we reverse the trial court's ruling that Ferguson's waiver was not knowing and intelligent.

## III. Conclusion

We hold that Ferguson validly waived his Fifth Amendment *Miranda* rights because the waiver was voluntary, knowing, and intel-

ligent. We reverse the trial court's suppression order regarding all statements made on November 14, 2008.